Keith A. Meyer (SBN 106104)
kmeyer@reedsmith.com
Amber S. Finch (SBN 222321)
afinch@reedsmith.com
Anthony S. Newman (SBN 235514)
anewman@reedsmith.com
REED SMITH LLP
355 South Grand Avenue, Suite 2800
Los Angeles, CA 90071-1514
Telephone:  +1 213 457 8000
Facsimile:  +1 213 457 8080

Kristina A. Robb (SBN 239353)
krobb@cc.sbcounty.gov
Principal Assistant County Counsel
Steven O'Neil (SBN 143075)
Interim County Counsel
SAN BERNARDINO COUNTY COUNSEL
385 N. Arrowhead Avenue, Fourth Floor
San Bernardino, CA 92415-0140
Telephone: +1 909 387 5455
Facsimile: +1 909 387 4069

Attorneys for Plaintiff
San Bernardino County

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN BERNARDINO COUNTY, a California public entity,<br><br>Plaintiff,<br><br>vs.<br><br>THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, a Pennsylvania insurance company,<br><br>Defendant. | Case No. 5:21-cv-01978<br><br>**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**<br><br>**JURY TRIAL REQUESTED** |

This is a civil action, over which this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, brought by Plaintiff San Bernardino County ("the County") against Defendant The Insurance Company of the State of Pennsylvania ("ICSOP").  The County, by and through its attorneys, hereby complains and alleges as follows:

## NATURE OF THE ACTION

1. This insurance coverage dispute arises from ICSOP's refusal to meet its coverage obligations under three multi-year insurance policies issued to the County for alleged property damage, investigation costs, and other losses arising from groundwater contamination allegedly emanating from the Chino Airport in San Bernardino County.

## PARTIES

2. The County is a political body and subdivision of the State of California organized and existing under the laws of the State of California, with its principal place of business located at 385 North Arrowhead Avenue in San Bernardino, California in San Bernardino County. The County owns and operates the Chino Airport, located in the City of Chino, also in San Bernardino County.

3. On information and belief, ICSOP is an insurance company organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 1271 Avenue of the Americas, 37th Floor, New York, New York. ICSOP is registered with the California Secretary of State to do business in the State of California, and on information and belief, ICSOP does business in the State of California and underwrites insurance policies for risks and persons located in this State, including the County.

## JURISDICTION

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. ICSOP is subject to personal jurisdiction in this Court because, *inter alia*, the subject insurance policies issued by ICSOP were delivered to the County in this State and this judicial district, and insure an entity – the County – that resides in this State and this judicial district.

## VENUE

6. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because ICSOP is subject to personal jurisdiction in this district, and a substantial part of the events giving rise to the claims asserted in the Complaint, including the underlying claim against the County relating to the Chino Airport and the delivery of the ICSOP policies to the County, occurred in this district.

## BACKGROUND

### The Chino Airport

7. The Chino Airport ("the Airport") is located on approximately 1,100 acres of land in San Bernardino County. It is the largest non-commercial airport in the region, and is a leading general aviation airport of choice for independent pilots, students and trainers, and corporate users.

8. The Airport, originally known as Cal-Aero Field, was first used as an airfield in 1940, when 385 acres of what is now the Airport was leased by the County to Cal-Aero Academy, a civilian-owned and operated flight academy for the training of civilians as military pilots. In 1941, an agency of the federal government, the Defense Plant Corporation ("DPC"), assumed the Cal-Aero lease and contracted with Cal-Aero Academy to provide flight instruction to U.S. Army Air Force cadets. Upon information and belief, from 1942 to October 1944, the Academy trained more than 11,000 cadets at the Airport.

9. In 1942, the federal government acquired 294.41 acres of adjoining land located to the east and south of Cal-Aero Academy, which increased the Airport property to roughly 679 acres. Following this purchase, the federal government constructed various improvements on the Airport property, including buildings, runways, taxiways, revetments, a sewage treatment plant, a storm drainage system, fences, and the installation of two 10,000 gallon and one 1,000 gallon underground storage tanks to store fuel.

10. In October 1944, Cal-Aero Academy closed and Airport operations were assumed by the DPC, and later by another federal agency, the Reconstruction Finance Corporation ("RFC").

11. From 1946 to 1947, the Aircraft Sales Division of the federal War Assets Administration used the entire Airport, under permit from the RFC, for aircraft sales, aircraft storage, and the dismantling of approximately 1,400 surplus military aircraft. Upon information and belief, after the surplus aircraft were scrapped, the aluminum components of the aircraft were melted down in a smelter located in the northeast quadrant of the Airport.

12. In 1949, the DPC terminated its lease with the County and the government-owned land was quitclaimed to the County, so the County became the owner of the entire 679 acre site.

13. In 1950, the County leased the Airport property to Pacific Airmotive Corporation ("Pacific Airmotive"), which used the Airport as a military and civilian aircraft modification facility. In 1961, the Pacific Airmotive lease was terminated and the facility was opened as a public airport known as the Chino Airport. By 1972, the Airport had leases with 45 different tenants, engaging in a range of businesses.

14. While the Airport has functioned as an airfield since the early 1940s, it has had a number of other distinct uses over the years. Businesses and activities conducted at the Airport have included: flight training, dismantling and smelting of surplus military aircraft, military and civilian aircraft modification, aircraft manufacturing, aircraft washing, aircraft stripping and painting, aircraft maintenance and repair, aircraft restoration, aircraft sales and storage, crop dusting, napalm production, mixing and loading of fire retardant chemicals for firefighting, and aircraft museums.

**The Alleged Groundwater Contamination and Related Cleanup and Abatement Orders**

15. In the late 1980s, trichloroethene ("TCE") was detected in groundwater samples from wells in the Chino area immediately downgradient of the Airport at levels in excess of the maximum contaminant threshold level for drinking water. Subsequent studies found two plumes of contaminants in the groundwater beneath the Airport with unsafe levels of various volatile organic compounds ("VOCs"), including but not limited to TCE, 1,2,3, trichloropropane ("TCP"), 1,1 dichloroethene ("DCE"), cis-1,2-dichloroethene, 1,2-dichloroethane ("DCA"), carbon tetrachloride and 1,4 dioxane. One plume is two miles long, and is alleged to extend 1.1 miles beyond the boundaries of the Airport. The second plume has merged into the primary plume and the commingled plume is up to one mile in width.

16. On or about October 31, 1990, the California Regional Water Quality Control Board, Santa Ana Region (the "RWQCB"), issued the first of three Cleanup and Abatement Orders ("CAOs") to the County with respect to the groundwater contamination allegedly emanating from the Airport (the "1990 Order").

17. The 1990 Order (CAO No. 90-134) references both the historic use of solvents at the Airport and waste disposal practices, and concluded that the groundwater contamination is a result of onsite sources of contamination at the Airport.

18. The 1990 Order found that "[i]ndustrial wastes generated from [the Airport] have been discharged to the ground in various ways," including "on-site landfills, industrial wastewater disposal systems, sewage disposal systems (sewage treatment plant and septic tanks), and direct disposal to the ground." It further found that "[i]ndustries likely to have used chlorinated solvents have operated at the Airport since the early 1940's," that such solvents were used in varying degrees and manners throughout the aircraft industry until the mid-1970s "primarily for parts cleaning, metal degreasing, painting and stripping," and that organic solvents had been subject

to a variety of waste management practices at the Airport, including "evaporation, direct disposal to the ground (particularly for stripping operations), longterm storage and accumulation, and disposal to the sanitary sewer."

19. The 1990 Order referenced a 1989 report prepared by the San Bernardino County Department of Health Services, entitled "Preliminary Report on Generators of PCE and TCE at the Chino Airport." The 1989 report identified 31 distinct areas in and around the Airport suspected of waste disposal in need of further investigation, including various sites used for aircraft painting and stripping, other areas used for the disposal of waste oil and fuel, the site of the former sewage treatment facility built by the federal government, the former location of a cesspool, certain areas known to have contained wastewater disposal ponds used for the collection of wastewater from aircraft cleaning operations, various surface water runoff collection sites, an area used for the smelting and teardown of surplus aircraft, numerous areas containing abandoned underground storage tanks, and multiple sites reportedly used as solid waste landfills. The 1990 Order identified all of these areas as potential sources of the groundwater contamination over the course of the decades-long history of the Airport's varied operations.

20. The 1990 Order required the County to investigate, cleanup, and abate any continuing sources of organic solvent discharges at the Airport. The 1990 Order also required the County to install a series of groundwater monitoring wells throughout the site to define the lateral and vertical extent of the groundwater contamination.

21. On or about June 27, 2008, the RWQCB issued the second CAO relating to the Airport, Order No. R8-2008-0064 (the "2008 Order"). Like the 1990 Order, the 2008 Order found that "TCE and several other VOCs in the groundwater underlying the Airport, and downgradient of the Airport, are the result of past discharges of waste at the Airport," and that the County "has caused or permitted … TCE and other VOCs to be discharged or deposited where it is, or probably will be, discharged into waters

of the state." The 2008 Order required the County to conduct additional investigations, including groundwater monitoring, and prepare a remedial action plan for the cleanup and abatement of the groundwater contamination.

22. Between 1989 and 2016, the County arranged for numerous environmental investigations involving more than 20 separate potential sources of the groundwater contamination at the Airport, known as "areas of concern." These investigations included the drilling and sampling of over 280 soil borings, installing and sampling 75 groundwater monitoring wells, and conducting a multitude of additional tests to determine the scope of the alleged contamination.

23. During this period, the County removed ten inactive underground storage tanks at the Airport containing gasoline, aviation fuel, and other chemicals. The County also collected 310 drums and/or containers of hazardous waste from various locations at the Airport, which contained, among other things, used motor oil, waste oil, urethane, chlorinated solvents, and acids. In August 2010, the County removed 51 drums of napalm that had been buried within the Airport grounds.

24. On or about January 11, 2017, the RWQCB issued the third CAO relating to the Airport, Order No. R8-2017-0011 (the "2017 Order"). The 2017 Order superseded the 2008 Order, and reiterated the findings from the first two Orders that TCE and several other VOCs in the groundwater underlying and downgradient of the Airport are the result of past discharges of waste at the Airport. In addition to the investigation and cleanup requirements set forth in the 2008 Order, the 2017 Order required the County to prepare and submit a final feasibility study for the remediation of groundwater contamination.

25. The County has incurred, and continues to incur, millions of dollars to avoid and/or minimize the County's potential liability in connection with the CAOs, remediate the alleged property damage asserted therein, and comply with the requirements of the CAOs and additional orders from the RWQCB.

**The ICSOP Policies**

26. In exchange for premiums paid, ICSOP sold the County three umbrella liability insurance policies covering the period from July 23, 1966 to July 23, 1975: (a) Policy No. 426-0772 (attached hereto as Exhibit A) covers the period from July 23, 1996 to July 23, 1969; (b) Policy No. 429-0989 (attached hereto as Exhibit B) covers the period from July 23, 1969 to July 23, 1972; and (c) Policy No. 4272-1195 (attached hereto as Exhibit C) covers the period from July 23, 1972 to July 23, 1975 (collectively, the "ICSOP Policies" or the "Policies"). Each of the ICSOP Policies was purchased by the County in the City of San Bernardino, California, and was delivered to the County in the City of San Bernardino.

27. Each ICSOP Policy obligates ICSOP to indemnify the County for, *inter alia*, damages and investigation expenses incurred because of property damage caused by or arising out of an "occurrence." In the "Coverage" section of each Policy, ICSOP "agrees, subject to [certain] limitations, terms, and conditions … to indemnify the [County] for all sums which the [County] shall be obligated to pay by reason of the liability … (a) Imposed upon the [County] by law, or (b) Assumed under contract or agreement by the [County] … for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of … Property Damage … caused by or arising out of each occurrence happening anywhere in the world."

28. The Policies define the term "Ultimate Net Loss" to mean "the total sum which the Assured … become[s] obligated to pay by reason of … property damage … either through adjudication or compromise, and shall also include ... expenses for … lawyers … and investigators and other persons, and for litigation settlement, adjustment and investigation of claims and suits …." The California Supreme Court has held that this "Ultimate Net Loss" language provides coverage for expenses incurred by a policyholder in responding to government agency orders to investigate, cleanup, and abate environmental pollution. Expenses incurred by the County to

comply with the CAOs and investigate and remediate the groundwater contamination asserted therein fall within the "Ultimate Net Loss" provision in the ICSOP Policies.

29. The term "Property Damage" is defined by the Policies to mean "loss or direct damage to or destruction of tangible property (other than property owned by the Named Assured)."

30. "Occurrence" is defined to mean:

> [A]n accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in … property damage … during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

31. The ICSOP Policies provide coverage excess of the limits of certain underlying insurance policies, as well as primary umbrella insurance coverage (subject to a $25,000 self-insured retention) for claims not covered by the underlying policies. The insurers that issued the policies underlying the ICSOP policies have denied coverage to the County with respect to claims arising from the alleged groundwater contamination emanating from the Airport. As a result, coverage for those costs incurred by the County to comply with the CAOs are covered by the ICSOP Policies.

32. Each of the ICSOP Policies are subject to a $9 million "Limit of Liability" "in respect of each occurrence," and a $9 million "Limit of Liability" "in the aggregate for each annual period where applicable." The only types of claims that are subject to the Policies' aggregate limits of liability are "Products Liability" and "Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured" – neither of which are at issue here. In prior litigation in this Court, ICSOP acknowledged that the Policies' aggregate limits are not applicable to property damage claims (such as the County's claim here). Accordingly, the only limitation on ICSOP's payment obligations with respect to an otherwise covered property damage claim is the Policies' $9 million per occurrence limit. ICSOP is

therefore required to pay up to $9 million for each "occurrence" giving rise to the property damage at issue, with no limit on the number of occurrences.

**The County's Claim for Insurance Proceeds and ICSOP's Responses**

33. The County provided timely notice of the CAOs to ICSOP.

34. Since at least 2010, the County has submitted periodic requests for reimbursement to ICSOP for amounts paid by the County to comply with the 2008 and 2017 Orders. ICSOP, in turn, has reimbursed the County for certain of these amounts but has reserved its right to deny coverage on a number of bases. In particular, ICSOP has reserved the right to limit coverage on the ground that the County's liability for the alleged property damage arises from a single occurrence, and therefore, coverage under the ICSOP Policies is limited to a total of $9 million.

35. Despite this reservation, ICSOP has refused to take a position as to whether the groundwater contamination is the result of one occurrence (and subject to only $9 million in coverage) or multiple occurrences (and subject to $9 million in coverage per occurrence). Instead, for over a decade, ICSOP has claimed to be "gathering information" and "investigating" the issue.

36. On September 9, 2021, ICSOP informed the County that it had paid $9 million toward the County's claim, and that to the extent the claim is the result of a single occurrence, the ICSOP Policies are exhausted. ICSOP thereafter refused to reimburse the County for any expenses in excess of $9 million, leaving the County with over $1.7 million in unreimbursed expenses to date.

37. While ICSOP has refused to say whether it believes the County's claim is subject to only one "per occurrence" limit of liability, it has nevertheless wrongfully imposed a single $9 million limit on the claim apparently based on its unilateral decision that the property damage arises from a single occurrence. ICSOP's action has resulted in the wrongful refusal to provide coverage for over $1.7 million in reimbursable expenses associated with the County's groundwater investigation to date.

38. The County's investigation and remediation responsibilities are ongoing and it is expected to incur millions of dollars in additional investigation and remediation costs to comply with the CAOs.

## COUNT I

### (Breach of Contract)

39. The County re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 38 above as though fully set forth herein.

40. The Policies obligate ICSOP to reimburse the County for those expenses paid by the County to avoid and/or minimize the County's liability, to comply with the 2008 and 2017 Orders, and to remediate the alleged groundwater contamination asserted therein. The Policies also obligate ICSOP to reimburse the County for expected future expenditures arising out of the 2017 Order, currently estimated to be in the tens of millions of dollars.

41. The County has tendered to ICSOP multiple claims for reimbursement of expenses incurred to comply with the 2008 and 2017 Orders and investigate, cleanup, and/or abate the alleged groundwater contamination asserted therein.

42. The alleged contamination of the groundwater is "property damage" within the meaning of the ICSOP Policies, and occurred, in whole or in part, during the policy periods of one or more of the ICSOP Policies.

43. No conditions, exclusions, or provisions in the ICSOP Policies bar or limit coverage for the County's claims for reimbursement other than the limit of liability for each "occurrence."

44. ICSOP has refused, and continues to refuse, to indemnify the County for any expenses paid and/or expected to be paid by the County to comply with the 2008 and 2017 Orders in excess of the single $9 million "per occurrence" cap that ICSOP has wrongfully imposed on its policy limits. ICSOP has taken this position based on its belief that the alleged groundwater contamination arises from only one occurrence.

45. The alleged groundwater contamination that gives rise to the County's liability arises from multiple occurrences and each such occurrence is subject to a separate limit of $9 million. The ICSOP Policies do not contain an aggregate limit for property damage claims, and therefore, the County is entitled to up to $9 million *per occurrence* under the ICSOP Policies, and not $9 million in total as ICSOP contends.

46. By refusing to reimburse the County for any policy benefits in excess of $9 million, ICSOP has breached its coverage obligations under the ICSOP Policies.

47. The County has performed in a timely manner all material conditions and covenants required to be performed by it under the ICSOP Policies, including, without limitation, paying premiums and providing timely notice, except to the extent that such performance has been excused, waived, or prevented by the representations, acts, or omissions of ICSOP.

48. As a direct and proximate result of ICSOP's breach, the County has been deprived of the benefit of the coverage provided under the ICSOP Policies for which premiums were paid, and has sustained substantial damages in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court, including without limitation, actual damages, consequential damages, out-of-pocket expenses, and other foreseeable economic losses, all in a sum to be proven at trial.

## COUNT II
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

49. The County re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 48 above as though fully set forth herein.

50. In every contract of insurance, there is an implied covenant of good faith and fair dealing that the insurance company will do nothing to interfere with the insured's right to receive benefits under the policy, that the insurer will give at least as much consideration to the interests of the insured as it does its own interests, that the insurer will exercise due diligence, good faith and fidelity in safeguarding the insured's interests, that the insurance company will deal ethically with the insured,

and that the insurance company will fairly and adequately inform the insured with respect to the nature and scope of the insurance coverage it contracted to receive.

51. ICSOP has breached its duty of good faith and fair dealing owed to the County under the ICSOP Policies in its handling and adjustment of the County's claim for coverage in the following respects, among others:

    a. Unreasonably and wrongfully slow-paying, delaying, denying, and refusing payment to the County for losses covered under the ICSOP Policies;

    b. Failing to provide a reasonable and timely explanation of the basis for refusing to pay the full amount of benefits owed to the County under the Policies;

    c. Failing to conduct a prompt, thorough, and objective investigation into the County's claim;

    d. Ignoring the abundance of publicly available evidence that supports a determination that the County's liability is the result of multiple occurrences;

    e. Failing to respond timely and substantively to the County's correspondence concerning the claim, in violation of Insurance Regulation section 2695.5(b) and California Insurance Code section 790.03(h)(2);

    f. Forcing the County to commence litigation to recover amounts due to the County under the ICSOP Policies;

    g. Refusing to pay the County amounts owed under the ICSOP Policies not because of any legitimate coverage defense, but rather to retain the use of the funds that the County is owed for as long as possible and to exert economic pressure on the County to either abandon its claim or accept low-ball settlement offers; and

  h. Depriving the County of the security and benefits of insurance provided under the ICSOP Policies to which the County is entitled.

52. ICSOP has resorted to self-help and arbitrarily cut off coverage to the County based on its own self-serving determination that the contamination results from a single occurrence without having undertaken the necessary investigation into the causes of the contamination or seeking guidance from a court on the issue. In a related case involving the same ICSOP Policies, this Court held that where the facts are in dispute, the determination of the number of occurrences is a question for the jury. *Ins. Co. of State of Pa. v. Cty. of San Bernardino*, No. 16-0128 PSG (SSx), 2017 U.S. Dist. LEXIS 185541, at *18 (C.D. Cal. July 24, 2017). Yet, without waiting for a jury to decide the question, let alone seeking any guidance from a court, ICSOP unilaterally terminated coverage to the County based on its ill-conceived belief that the contamination is the result of only one occurrence.

53. ICSOP's sole motivation in cutting off coverage to the County was to further its own financial interests at the expense of the County at the very time that the County has been looking to ICSOP to fulfill its coverage obligations. In so doing, ICSOP placed its own financial interests ahead of those of the County and breached the implied covenant of good faith and fair dealing.

54. As a direct and proximate result of the aforementioned wrongful conduct by ICSOP, the County has suffered actual and consequential damages, out-of-pocket expenses, attorneys' fees and costs, as well as other foreseeable economic losses, all to the County's detriment in an amount to be shown at the time of trial.

55. In committing these actions, ICSOP acted knowingly, intentionally, oppressively, maliciously and/or fraudulently, with a conscious disregard of the County's rights, reflecting malice and/or oppression as defined under California Civil Code section 3294, with the intention of benefitting itself financially and with the intention of causing, or recklessly disregarding the probability of causing, injury to the County. In so acting, ICSOP intended to and did vex, injure, harass, and annoy the

County and deprived the County of its rights under the ICSOP Policies. As a result of this conduct by ICSOP, the imposition of punitive and exemplary damages against ICSOP is warranted in an amount sufficient to punish and make an example of ICSOP to deter such conduct in the future.

56. Consistent with the holding in *Brandt v. Superior Court*, 37 Cal. 3d 818 (1985), the County also is entitled to recover any and all attorneys' fees that it reasonably incurs to obtain the policy benefits that have been wrongfully withheld by ICSOP.

## COUNT III

### (Declaratory Relief)

57. The County re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 above as though fully set forth herein.

58. There is a justiciable and actual controversy between the County and ICSOP as to whether ICSOP is obligated under the ICSOP Policies to pay any further amounts that have been or will be incurred by the County in the future to comply with and avoid and/or minimize the County's liability in connection with the 2008 and 2017 Orders and related governmental orders and to remediate the groundwater contamination alleged therein.

59. A judicial declaration is necessary and appropriate at this time to determine the County's additional rights to coverage under the ICSOP Policies with respect to the alleged groundwater contamination emanating from the Airport.

60. The Court, therefore, should enter an Order determining the rights and obligations of the parties with respect to coverage under the ICSOP Policies for the alleged groundwater contamination emanating from the Airport.

## PRAYER FOR RELIEF

WHEREFORE, the County respectfully requests that judgment be entered in its favor and against ICSOP as follows:

### On the First Claim For Relief:

1. For actual damages in an amount to be determined at the time of trial; and

2. For consequential damages in an amount to be determined at the time of trial.

### On the Second Claim For Relief:

1. For actual damages in an amount to be determined at the time of trial;

2. For consequential damages in an amount to be determined at the time of trial;

3. For punitive damages to punish or make an example of ICSOP; and

4. For reasonable attorney's fees incurred by the County in its efforts to obtain policy benefits wrongfully withheld by ICSOP.

### On The Third Claim For Relief:

1. For a judgment determining the rights and obligations of the parties with respect to coverage under the ICSOP Policies for the alleged groundwater contamination emanating from the Airport.

### On All Claims For Relief:

1. For attorney's fees and costs incurred herein;

2. For costs of suit incurred herein;

3. For prejudgment and post-judgment interest; and

4. For such other and further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

The County hereby demands a trial by jury under the United States Constitution and Federal Rule of Civil Procedure 38(a).

DATED: November 22, 2021

                                                            REED SMITH LLP

By: /s/Keith A. Meyer
     Keith A. Meyer
     Attorneys for Plaintiff,
     San Bernardino County

REED SMITH LLP
A limited liability partnership formed in the State of Delaware